UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | |
|---|---|
| CHEMTALL INCORPORATED, | |
| Plaintiff, | Civil Case No. _____ |
| v. | **JURY TRIAL DEMANDED** |
| BASF SE, | |
| Defendant. | |

## COMPLAINT

Plaintiff Chemtall Incorporated hereby files this complaint against Defendant BASF SE, and alleges as follows:

1.      This is a diversity action to hold BASE SE, the largest chemical company in the world, accountable for having made a bad faith assertion of patent infringement against Plaintiff Chemtall Incorporated, a Georgia corporation, and for having engaged in obstruction of justice, fraud, and other wrongful and criminal acts in support of its bad faith conduct. This action arises under the Georgia Bad Faith Assertions of Patent Infringement Act of 2014, the Georgia Fair Business Practices Act of 1975, and the Georgia Racketeer Influenced and Corrupt Organizations Act of 1982.

## PARTIES AND JURISDICTION

2.      Plaintiff Chemtall Incorporated ("Chemtall") is a Georgia corporation having its principal place of business in Riceboro, Georgia.

3.      Defendant BASF SE f/k/a BASF AG ("BASF SE") is a German corporation having its headquarters in Ludwigshafen, Germany.

4.     This Court has jurisdiction to hear this action under at least 28 U.S.C. § 1332(a), in that the parties are of diverse citizenship and the amount in controversy exceed the sum or value of $75,000.00 exclusive of interest and costs.

## FIRST CLAIM

5.     Between May 27, 1997 and approximately September 15, 2014, Defendant BASF SE was the record owner of U.S. Patent No. 5,633,329 (the "'329 Patent").

6.     The '329 Patent issued on the basis of a claim that five BASF SE employees (collectively, "Hähnle et al.") purportedly were the original and first inventors of the subject matter claimed in the '329 Patent.

7.     In truth and in fact, Hähnle et al. were not the original and first inventors of the subject matter claimed in the '329 Patent.

8.     The claims in the '329 Patent describe a process (the "Sanyo SANWET® Process") that (a) Sanyo communicated to Defendant BASF SE's predecessor-in-title, Celanese Corp. ("Celanese"), in late 1984, and that (b) BASF SE, through predecessors-in-title, commercially exploited in the United States long before Hähnle et al. made the alleged "invention" claimed in the '329 Patent.

9.     Beginning at a time currently unknown to Plaintiff, but not later than the date in approximately 1999 when Defendant BASF SE acquired the SANWET® super absorbent polymer business of Clariant International Ltd. (the "1999 BASF SANWET® Acquisition Date"), Defendant BASF SE had actual knowledge that Hähnle et al. were not the original and first inventors of the subject matter claimed in the '329 Patent.

10.     Beginning at a time currently unknown to Plaintiff, but not later than the 1999 BASF SANWET® Acquisition Date, Defendant BASF SE had actual knowledge that the '329

Patent claimed subject matter that Sanyo had communicated to BASF SE's predecessor-in-title, Celanese, before Hähnle et al. made the alleged "invention" claimed in the '329 Patent.

11.     Beginning at a time currently unknown to Plaintiff, but not later than the 1999 BASF SANWET® Acquisition Date, Defendant BASF SE had actual knowledge that the '329 Patent claimed subject matter that BASF SE predecessors-in-title, including Celanese and Hoechst Corp. ("Hoechst"), had commercially exploited in the United States more than one year before Hähnle et al. filed the United States patent application that matured as the '329 Patent.

12.     Beginning at a time currently unknown to Plaintiff, but not later than the 1999 BASF SANWET® Acquisition Date, Defendant BASF SE had actual knowledge that the '329 Patent was false in its description of the inventorship and legal status of the subject matter claimed in that patent.

13.     Beginning at a time currently unknown to Plaintiff, but not later than shortly following the 1999 BASF SANWET® Acquisition Date, BASF SE came to employ or control one or more individuals, including Uwe Stüven, who had personal knowledge of the history of the Sanyo SANWET® Process, the existence and location of BASF SE documents describing the Sanyo SANWET® Process, and commercial exploitation of the Sanyo SANWET® Process in both a pilot plant and a manufacturing plant located in Portsmouth, Virginia long prior to January 31, 1995, including personal knowledge that Mr. Stüven acquired as part of his work to establish and manage one or more similar Sanyo licensed SANWET® plants in Germany, including a Sanyo-licensed plant in Casella which started operations in or about 1990 and whose Sanyo licensed technology was also acquired by BASF SE.

14.     The '329 Patent was set to expire on May 27, 2001; however, on or about October 26, 2000, using the mails or instrumentalities of interstate commerce, Defendant BASF SE

3

caused a "maintenance fee" to be paid to the United States Patent and Trademark Office (the "PTO") for the purpose, and with the effect, of maintaining the '329 Patent under the false and fraudulent pretense that Hähnle et al. were the original and first inventors of the subject matter claimed in the '329 Patent, when BASF SE had actual knowledge that Hähnle et al. were not, in fact, the original and first inventors of the subject matter claimed in the '329 Patent.

15.     The '329 Patent was set to expire on May 27, 2005; however, on or about October 20, 2004, using the mails or instrumentalities of interstate commerce, Defendant BASF SE caused a "maintenance fee" to be paid to the PTO for the purpose, and with the effect, of maintaining the '329 Patent under the false and fraudulent pretense that Hähnle et al. were the original and first inventors of the subject matter claimed in the '329 Patent, when BASF SE had actual knowledge that Hähnle et al. were not, in fact, the original and first inventors of the subject matter claimed in the '329 Patent.

16.     The '329 Patent was set to expire on May 27, 2009; however, on or about October 30, 2008, using the mails or instrumentalities of interstate commerce, Defendant BASF SE caused a "maintenance fee" to be paid to the PTO for the purpose, and with the effect, of maintaining the '329 Patent under the false and fraudulent pretense that Hähnle et al. were the original and first inventors of the subject matter claimed in the '329 Patent, when BASF SE had actual knowledge that Hähnle et al. were not, in fact, the original and first inventors of the subject matter claimed in the '329 Patent.

17.     Plaintiff Chemtall manufactures polyacrylamide ("PAM") products in manufacturing plants located in Riceboro, Georgia.

18.     Plaintiff Chemtall and BASF SE are direct competitors in the business of selling powder PAM products.

19.     Since 1998, as part of one step in its multi-step process of making powder PAM products, Chemtall has in some of its plants used tubular polymerization reactors whose design was based on an unpatented Sanyo reactor design used by a Korean affiliate of Chemtall.

20.     Beginning at a time currently unknown to Chemtall, but not later than September 15, 2014, Defendant BASF SE decided to make a bad faith assertion that Chemtall, by using tubular polymerization reactors in some of its powder PAM manufacturing plants, purportedly infringed the '329 Patent.

21.     As of September 15, 2014, Defendant BASF SE had actual knowledge that Hähnle et al. were not the original and first inventors of the subject matter claimed in the '329 Patent, and that the success of any claim for alleged infringement of the '329 Patent depended crucially on spoliation or suppression of evidence that the Sanyo SANWET® Process was known or used in the United States by persons other than Hähnle et al. prior to January 31, 1995.

22.     As of September 15, 2014, Defendant BASF SE had actual knowledge that, if it attempted to sue in its own name for alleged infringement of the '329 Patent, it would be subject to sanctions if it refused to make discovery of BASF SE documents and information showing that (a) the Sanyo SANWET® Process was known or used in the United States by persons other than Hähnle et al. prior to January 31, 1995, and (b) the Sanyo SANWET® Process had been commercially exploited in the United States more than one year before Hähnle et al. filed the United States application that matured as the '329 Patent.

23.     On or about September 15, 2014, in contemplation of making a bad faith assertion of patent infringement against Chemtall and Chemtall affiliates, Defendant BASF SE executed a document (the "2014 Assignment") by which BASF SE purported to transfer ownership of the '329 Patent to one of its indirect corporate subsidiaries, non-party BASF Corp.

24.     The 2014 Assignment had no legitimate business purpose, but was entered into for the sole purpose of obstructing the administration of justice in United States legal proceedings and furthering a scheme to try and obtain money or property from Chemtall and Chemtall affiliates under the false and fraudulent pretense that Hähnle et al. were the original and first inventors of the subject matter claimed in the '329 Patent when BASF SE had actual knowledge that that was not the case.

25.     On September 23, 2014, Defendant BASF SE caused a civil action to be filed entitled *BASF Corp. v. SNF Holding Co.*, Civil Action No. 4:14-cv-02733, in the United States District Court for the Southern District of Texas (the "Texas Action").

26.     BASF SE caused the Texas Action to be filed in bad faith, with actual knowledge that Hähnle et al. were not the original and first inventors of the subject matter claimed in the '329 Patent, and with intent to try and obtain money or property from Chemtall by wrongful and fraudulent means, including suppression of evidence showing the invalidity of the '329 Patent.

27.     On July 8, 2015, BASF SE's agent and proxy, BASF Corp., was requested by Chemtall to produce "[a]ll documents and things referring or relating to any manufacturing method embodying any part of the subject matter claimed in the Patent-in-Suit."

28.     Chemtall's document request identified in paragraph 27, above, encompassed documents referring or relating to the Sanyo SANWET® Process.

29.     On August 10, 2015, BASF SE's agent and proxy, BASF Corp., served a response to Chemtall's document request identified in paragraph 27, above, which failed to identify or to disclose the existence of responsive documents concerning the Sanyo SANWET® Process.

30.     On August 6, 2015, the PTO instituted IPR2015-00600 (the "IPR Proceeding") after concluding that certain prior art documents established a "reasonable likelihood" that

claims 1-7 of the '329 Patent failed to satisfy the non-obvious subject matter condition for patentability.

31.     On November 10, 2015, using the mails or instrumentalities of interstate commerce, Defendant BASF SE's agent and proxy, BASF Corp., made a series of knowingly false assertions to the PTO, including the following:

(a)     "despite decades of research, no one came close to discovering BASF's solution to removing sticky polymer gels from reactors—until the invention described in the '329 patent" [Patent Owner's Response to Petition for *Inter Partes* Review of U.S. Patent No. 5,633,329 ("PO Response") at 1]

(b)     "piston-based approaches began to appear in the art and ultimately became the accepted approach to polymer removal before the invention in the '329 patent" [PO Response at 6]

(c)     "The '329 inventors created a new approach—going against accepted wisdom and the then state of the art—to achieve polymer removal. They determined that changes to reactor design providing for a conical taper within a specific angle range and with specific diameter ratios, would allow inert gas to achieve removal of the polymer gel. This novel redesign avoided both the gas bypass and reactor wear problems that plagued the prior art." [PO Response at 6]

(d)     "The '329 patent accordingly was an efficient and practical breakthrough that revolutionized the removal of sticky polymer gel, and materially enhanced the manufacture of certain types of polymers." [PO Response at 7]

(e)     "Considering the totality of the prior art and the known problems, using inert gas to remove sticky polymer gels from a reactor is contrary to accepted wisdom in the art." [PO Response at 30]

(f)     "At the time of the invention, a person of ordinary skill would have understood that inert gas was not a practical solution to removing polymer gel from a reactor." [PO Response at 31]

(g)     "the prior art spanning three decades suggests that the '329 patent's solution was unknown." [PO Response at 35-36]

(h)     "Even assuming the prior art separately taught conical tapers and inert gas, the prior art does not teach conical tapers with inert gas,

and neither conical tapers nor inert gas were tested or studied for their properties to remove polymer without gas bypass to successfully remove polymer gel." [PO Response at 46]

(i)     "The prior art does not disclose the combination of taper angles, taper diameters, or inert gas pressures that are sufficient to perform polymer removal, or credible reasoning for using the claimed taper angle, taper diameters, and gas pressures." [PO Response at 47]

(j)     "the prior art fails to disclose the pressures of inert gas necessary to discharge a gelatinous reaction mixture from a reactor having a conical taper." [PO Response at 52]

(k)     "the prior art discouraged the use of inert gas for the purposes of discharge. Thus, a person of ordinary skill would not expect that inert gas would be effective in removing a gelatinous reaction mixture from a reactor having a conical taper" [PO Response at 52-53]

(l)     "Indeed, those who attempted to use inert gas to remove polymer gel from a reactor found that it was not a viable option on its own." [PO Response at 57]

(m)     "prior to the invention of the '329 patent, conical tapers and inert gas had never been used to remove polymer gels from reactors" [PO Response at 59]

(n)     "no art even suggested conical tapers and inert gas could be used in that way." [PO Response at 59].

32.     Each of the statements quoted in paragraph 31, above, was false, was known by Defendant BASF SE to be false when made, and was made with specific intent to defraud the PTO into believing, falsely, that Hähnle et al. purportedly had been the original and first inventors of the subject matter claimed in the '329 Patent when BASF SE knew that was not the case.

33.     Contrary to what BASF SE's agent and proxy, BASF Corp., falsely represented to the PTO on November 10, 2015, the Sanyo SANWET® Process comprises use of conical tapers and inert gas to remove polymer gels from reactors and had been successfully performed and commercially exploited in the United States by BASF SE's own predecessors-in-title, Celanese and Hoechst, long before Hähnle et al. made the alleged "invention" claimed in the '329 Patent.

34.     On August 2, 2016, after BASF SE had made the false factual assertions repro-
duced in paragraph 31, above, the PTO was deceived into accepting "Patent Owner's argument
that one of ordinary skill in the art would not have had a reasonable expectation of success in us-
ing a conical taper and inert gas pressure alone (the combination proposed by Petitioner) to re-
move a sticky, gelatinous product from a reactor," and issued a Final Written Decision conclud-
ing that "no claim of the '329 Patent is held unpatentable."

35.     At all times during the pendency of the IPR Proceeding, Defendant BASF SE had
custody, possession, or control of evidence, including knowledge held by Uwe Stüven, that con-
tradicted the false factual assertions quoted in paragraph 31, above, and that also contradicted
similar false factual assertions of F. Joseph Schork, a Georgia resident, that were submitted in the
IPR proceeding on November 10, 2015, without the benefit of evidence that BASF SE willfully
suppressed and concealed from him.

36.     Defendant BASF SE's fraudulent scheme collapsed when, in June 2017, Sanyo
voluntarily provided Plaintiff's parent corporation with copies of correspondence and documents
from the 1980's which showed that the Sanyo SANWET® Process comprised use of conical ta-
per and inert gas pressure to remove sticky, gelatinous product from a reactor – in direct contra-
diction of Defendant BASF SE's assertion to the PTO in the IPR Proceeding on November 10,
2015, that: "prior to the invention of the '329 patent, conical tapers and inert gas had never been
used to remove polymer gels from reactors" [PO Response at 59].

37.     By engaging in the conduct set forth above, Defendant BASF SE has caused
Chemtall to suffer repeated injuries to its business and property in Georgia, including losses of
money and property caused by BASF SE's pressing of the Texas Action and losses of litigant's
rights in the IPR Proceeding.

38.     Defendant BASF SE has sponsored, controlled, directed, materially assisted, approved, and participated in the wrongful and fraudulent acts described in paragraphs 16-36, above.

39.     By its actions as set forth above, Defendant BASF SE is liable to Plaintiff for violating Ga. Code § 10-1-771(a) which provides: "A person shall not make a bad faith assertion of patent infringement."

## SECOND CLAIM

40.     Paragraphs 1–39, above, are realleged and incorporated by reference as if set forth in full.

41.     Ga. Code § 10-1-773(a) provides that a violation of Ga. Code § 10-1-771(a) "shall constitute an unfair and deceptive act or practice in the conduct of consumer transactions under Part 2 of Article 15 of this chapter, the 'Fair Business Practices Act. . . .'"

42.     On or about July 31, 2017, Plaintiff delivered to BASF SE a written demand for relief, identifying the claimant and reasonably describing the unfair or deceptive act or practice relied upon and the injury suffered.

43.     By its actions as set forth above, Defendant BASF SE is liable to Plaintiff for violating Ga. Code § 10-1-393(a) which provides: "Unfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce are declared unlawful."

## THIRD CLAIM

44.     Paragraphs 1–43, above, are realleged and incorporated by reference as if set forth in full.

45.     Beginning at a time currently unknown to Chemtall, but not later than September 15, 2014, Defendant BASF SE devised a scheme or artifice to defraud Chemtall and to obtain

money or property from Chemtall by means of false or fraudulent pretenses, including (a) the false and fraudulent pretense that Hähnle et al. purportedly were the original and first inventors of the subject matter claimed in the '329 Patent; and (b) the false and fraudulent pretenses set out in paragraph 31, above.

46.     Beginning at a time currently unknown to Plaintiff, but not later than October 26, 2000, Defendant BASF SE devised a scheme or artifice to defraud the PTO and to obtain property from the U.S. Government by means of false or fraudulent pretenses, including (a) the false and fraudulent pretense that Hähnle et al. purportedly were the original and first inventors of the subject matter claimed in the '329 Patent; and (b) the false and fraudulent pretenses set out in paragraph 31, above.

47.     For the purpose of executing the fraudulent schemes identified in paragraphs 45 and 46, above, BASF SE caused to be transmitted, by means of the mails or wire communications in interstate commerce, the payments referred to in paragraphs 14-16, above, and the writings and signals referred to in paragraphs 23-25, 29, 31, and 35, above.

48.     By engaging in the conduct set forth above, defendant BASF SE has acquired or maintained interests in the '329 Patent through a pattern of racketeering activity, which pattern of racketeering activity has included (i) corruptly obstructing or impeding the due administration of justice in the IPR Proceeding, in violation of Ga. Code § 16-14-3(5)(B) and 18 U.S.C. § 1505; (ii) corruptly endeavoring to obstruct or impede the due administration of justice in the IPR Proceeding, in violation of Ga. Code § 16-14-3(5)(B) and 18 U.S.C. § 1505; (iii) corruptly obstructing or impeding the due administration of justice in the Texas Action, in violation of Ga. Code § 16-14-3(5)(B) and 18 U.S.C. § 1503; (iv) corruptly endeavoring to obstruct or impede the due administration of justice in the Texas Action, in violation of Ga. Code § 16-14-3(5)(B) and 18

11

U.S.C. § 1503 (v) mail fraud in violation of Ga. Code § 16-14-3(5)(C) and 18 U.S.C. §§ 1961(1), 1341; and (vi) wire fraud in violation of Ga. Code § 16-14-3(5)(C) and 18 U.S.C. §§ 1961(1), 1343.

49.     By engaging in the conduct set forth above, Defendant BASF SE has caused Chemtall to suffer repeated injuries to its business and property in Georgia, including losses of money and property caused by BASF SE's pressing of the Texas Action and losses of litigant's rights in the IPR Proceeding.

50.     By engaging in the conduct set forth above, Defendant BASF SE has violated Ga. Code § 16-14-4(a), which provides in part:  "It shall be unlawful for any person, through a pattern of racketeering activity or proceeds derived therefrom, to acquire or maintain, directly or indirectly, any interest in . . . personal property of any nature."

## FOURTH CLAIM

51.     Paragraphs 1-50, above, are realleged and incorporated by reference as if set forth in full.

52.     Defendant BASF SE conspired with BASF Corp. to violate Ga. Code § 16-14-4(a).

53.     Chemtall has been injured in its business or property by reason of BASF SE's conduct set forth above, including losses of money and property caused by BASF SE's pressing of the Texas Action and losses of litigant's rights in the IPR Proceeding.

54.     By engaging in the conduct set forth above, Defendant BASF SE has violated Ga. Code § 16-14-4(c), which makes it "unlawful for any person to conspire or to endeavor to violate any of the provisions of subsection (a) or (b) of this Code section."

55.     No claims are made under any split-recovery or other statute that requires any portion of any treble, punitive, exemplary or other damages be paid to the State of Georgia or to

anyone other than to Plaintiff; accordingly, no portion of any damages claimed in this action are subject to any claim by the State of Georgia or by anyone other than Plaintiff.

WHEREFORE, Chemtall prays for the following relief:

(A)     That summons and process be issued requiring the Defendant to appear as provided by law to answer the allegations of this Complaint;

(B)     That Chemtall have a TRIAL BY JURY of all issues so triable;

(C)     That Chemtall recover from Defendant compensatory damages as provided by law;

(D)     That Chemtall recover from Defendant punitive damages as provided by law;

(E)     That Chemtall recover from Defendant treble damages as provided by law;

(F)     That Chemtall recover from Defendant all reasonable attorneys' fees pursuant to Ga. Code § 13-6-11; and

(G)     That Chemtall have all such other and further relief as the Court deems just and appropriate;

Respectfully submitted,
this 6th day of October, 2017

By:   /s/ Brent J. Savage, Sr.
       Brent J. Savage, Sr.
       Georgia State Bar:   627450

SAVAGE, TURNER, DURHAM,
PINCKNEY & SAVAGE
   Brent J. Savage, Sr.
   James D. Durham
102 East Liberty Street, 8th Floor
Savannah, GA 31401
(912) 231-1140

ATTORNEYS FOR PLAINTIFF

13

Of Counsel:

HUGHES HUBBARD & REED LLP
  William J. Maguire
  Malik Havalic
One Battery Park Plaza
New York, NY 11217
(212) 837-6000.